**DANIEL et al. v. LAYTON et al.**
No. 5253.

Circuit Court of Appeals, Seventh Circuit.
Jan. 23, 1935.

Rehearing Denied Feb. 19, 1935.

William S. Oppenheim, Earle E. Ewins, and Edward S. Price, all of Chicago, Ill., for appellants.

Roy O. West, Percy B. Eckhart, William M. Klein, and Lewis C. Jesseph, all of Chicago, Ill., for appellee Abel Davis, receiver.

Fred P. Carr, of Des Moines, Iowa, and Robert A. Frantz and Arthur J. Jennett, both of Chicago, Ill., for appellee Central Life Assur. Soc. (Mutual).

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

EVANS, Circuit Judge.

In November, 1932, the Illinois Life Insurance Company, hereinafter called the Illinois Life, became financially embarrassed and Abel Davis was appointed receiver of its property. At this date there was outstanding $140,000,000 of insurance held by 70,000 policyholders. Its reserves had become greatly impaired, and it had insufficient cash on hand to meet operating expenses, policyholders' loans, cash surrender claims, death claims, and other liabilities. Among those to file claims against it was a group whose claims arose out of so-called "post agency renewal commission contracts." Although their claims are disputed by the receiver and have not been passed upon, they assert that approximately $600,000 is due them.

The receiver found (and so reported) that the affairs of the Illinois Life were such that a reinsurance by a stronger and a better company was both advisable and necessary. After a thorough study of the perplexing problems which the negotiating of a reinsurance contract entails, the receiver submitted to the court a proposed contract of reinsurance with the Central Life Assurance Society of Iowa. In selecting the reinsuring company and in drafting the proposed contract, he was aided by the insurance commissioner of the State of Illinois

and was advised by three disinterested and distinguished individuals whose experience in insurance matters had been wide and whose knowledge of insurance law was well recognized. This proposed contract was, after full hearing, duly approved by the court.

This appeal is from an order which effectuated this reinsurance contract. Appellants complain because (a) under the plan which was adopted they were not treated as fairly as other creditors, and (b) the valuation of the company's assets and the discharge of appellants' claims upon the basis of such valuation were prejudicial to them.

The master found and the court approved the finding that the fair value of the assets of the company was $4,239,999.73. The total indebtedness was approximately $27,240,000, of which $24,281,462.43 represented the required reserve of the company and $2,957,233.73 covered all other claims filed with the receiver.

The court ordered the receiver to transfer the assets of the Illinois Life to the Central Life Assurance Society. The transferee gave the necessary assurance that it would furnish the receiver with funds upon the determination of the amount necessary to pay dividends upon claims filed and allowed against the receiver, as well as unpaid receivership expenses. The contract of reinsurance permitted, but did not require, policyholders to accept the terms of the reinsurance contract. Appellants, if their claims are finally allowed, will be paid upon the basis of the value of the assets less receivership expenses. They will receive such proportion thereof as their claims bear to the total indebtedness.

Appellants' first attack upon the order is predicated upon what they claim is a grossly inadequate valuation of the assets of the Illinois Life. They likewise claim that there was no competent evidence before the master upon which a just valuation could be based. Likewise, they argue that the valuation witnesses were not sufficiently familiar with the properties covered by the Illinois Life's mortgages to qualify them to testify.

This issue is largely one of fact, although the qualification of the witnesses, as well as their fact information, may well involve questions of law. Five witnesses gave testimony of values. They were well qualified in their respective fields to appraise the value of the real estate. Each had had extended experience. They were disinterested. Their testimony was in no way contradicted.

The task of appraising the value of these securities was a most difficult one. Mathematical accuracy was quite impossible. The total number of farm mortgages was approximately 2,000, scattered throughout a half dozen states. They were for the most part in default both as to principal and interest. The percentage in good standing was small compared to the amount under foreclosure. On many tracts there were back taxes due and unpaid.

As illustrative of the conditions generally, the figures concerning Kansas mortgages might be given. There were 87 mortgages in good standing, aggregating $342,108.34. There were 618 delinquent mortgages, aggregating $3,190,646.45. 173 mortgages, aggregating $1,124,815.24, were under foreclosure. The title to 63 tracts of land, aggregating 26,481.62 acres, had been acquired through foreclosure or other proceedings. The appraised value of the mortgages and land acquired was approximately 30% of their book value.

The witnesses and the special master divided the assets into three classes. One included farm mortgages. Another covered real estate mortgages and home office buildings in Chicago. The third class included investments in bonds, notes, and stocks. The Chicago real estate mortgages and securities were valued at $1,307,250. The home office building was valued at $500,000. The Hotel La Salle security was appraised at $650,000.

We think there is no legitimate basis for criticizing the valuation placed upon the mortgages covering Chicago property. The loans were larger, and a more thorough study was possible. If anyone could fairly complain of their valuation we are inclined to believe it would be the Central Life Assurance Society.

We are, however, dealing with the report of a master which has been confirmed by the District Court. We have no hesitancy, therefore, in accepting the valuation not only of Cook County mortgages and real estate, but the investments in bonds, notes, stock, and collateral loans as well. The Chicago real estate and the stock and bonds, etc., were not only bad investments, but they represented loans of Illinois Life's funds to enterprises owned and officered by the officers of Illinois Life. These enterprises were in desperate financial straits, and so in addition to bad judgment there was added gross cupidity on the part of the officers, both of which were reflected in the charac-

ter and value of the loans made and the securities acquired.

As to the value of the farm mortgages, there is greater room for an honest difference of opinion. As to them the witnesses would have been better qualified to speak if they had personally examined each tract of land, interviewed the borrower (if he had not already abandoned the premises), and otherwise acquired first hand information respecting the facts which form the basis of sound judgment on valuation. Differences in opinion as to value these days generally reflect either optimism or discouragement. Optimists look forward hopefully to a rapid rise in farm real estate. To them normalcy is measured by wartime prices. The discouraged pessimist can see no bright hope for the future of the farmer and no rise in the price of farm lands. In fact, he is confident that prices will decline. The court should be neither bonist nor malist. He cannot base findings of value on hopes only, for, if he does, there will be a harvest of regrets. Nor should he be too seriously dismayed by defaults in interest, back taxes, or even farm abandonments. The farm price pendulum swings widely and at times rapidly.

We are not prepared to say the witnesses were lacking in qualifications. They were men of wide experience in such matters. If their testimony be not stricken, then it follows that the master's report is well supported by opinion evidence.

Appellants further argue that the court did not equally distribute the assets among the creditors. This charge is based upon a false fact assumption, namely, that the policyholder creditors received more than appellants.

 We cannot accept appellants' fact assumption. The court determined the value of the property. It was also required to determine the amount of the claims. The aggregate of the policyholders' claims is not challenged. It is stated that under the reinsurance contract the reinsurance company only placed a lien of 70% against the policyholders' claims. From this fact it is argued that the policyholders are receiving 30% whereas appellants will receive approximately 15% on their claims. Appellants err in assuming that the policyholders are receiving 30%. The policyholders who avail themselves of the reinsurance contract are required to pay premiums for years to come. The amount which the reinsuring company might legitimately allow because of such future premium payments must be deducted from said 30%.

Moreover, appellants are not concerned with the terms of the reinsuring contract. It does not affect or concern them. They should not be permitted to defeat the well-matured plan of the receiver merely because the reinsurance contract may be a highly desirable one from the policyholders' viewpoint. They are interested merely in the allowance and payment of their claims. If they receive their proportionate share of the assets they cannot be heard to complain of the highly favorable contract of reinsurance which benefits the policyholders.

 Nor do we see merit in appellants' contention that they are entitled to have the property sold and the affairs of the company liquidated, even though they frustrate the plan of reinsurance and defeat the rights of the policyholders whose claims are perhaps fifty times as great as appellants'. The case of Coriell v. Morris White, Inc. (C. C. A.) 54 F.(2d) 255, is authority for the course pursued here. Even in the absence of precedent we think such a plan must meet with judicial approval. The contentions of one creditor must be considered in the light of their effect on other creditors. This, we think, is particularly true in insurance company reorganizations or where the insurance of an insolvent insurance company is reinsured in another company. All that any creditor may legitimately ask is fairness in the distribution of assets. In determining fairness the court may, in cases like the instant one, accept appraisal values instead of resorting to liquidation through sales, etc.

It is finally argued that all the costs of the receivership should have been charged to the policyholders as most of the expenses were incurred in negotiating the reinsurance contract. The evidence does not bear out the latter statement. Appellants' claims are small as compared to those of the policyholders whose claims were undisputed. Both the validity and the amount of appellants' claims are challenged. The time and expense devoted to them, we believe, will (amount considered) exceed the time and expense devoted to looking after the policyholders' claims.

Other good reasons are suggested for overruling this assignment of error, which need not be considered. Nor need we discuss the additional grounds advanced by ap-

pellees in favor of the affirmance of the decree of the District Court.

The decree is

Affirmed.